# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN
# GREEN BAY DIVISION

ABBY SWAN, ADAM FAUST, AND
CHRISTOPHER BAIRD,

      Plaintiffs,

v.

BROOKE ROLLINS, in her official capacity as
United States Secretary of Agriculture, and
NATIONAL DAIRY PROMOTION AND
RESEARCH BOARD,

      Defendants.

## COMPLAINT

Plaintiffs Abby Swan, Adam Faust, and Christopher Baird, by their undersigned attorneys at the Wisconsin Institute for Law & Liberty, hereby allege as follows:

## INTRODUCTION

1. This lawsuit is brought by three Wisconsin dairy farmers forced to subsidize the Dairy Checkoff: a burdensome federal program that leads to the demise of small farms under the guise of environmental "sustainability." Not only is this compelled subsidy Orwellian, but it also violates the First Amendment to the United States Constitution and the Administrative Procedure Act.

2. Rooting out burdensome environmental, social, and governance (ESG) regulatory regimes has been a federal policy priority since the earliest hours of

President Trump's second term. On day one, President Trump issued Executive Order (E.O.) 14162, *Putting America First in International Environmental Agreements*, directing the United States to formally withdraw from the Paris Climate Agreement under the United Nations Framework Convention on Climate Change, as well as directing "the head of any department or agency" to "prioritize economic efficiency, the promotion of American prosperity, consumer choice, and fiscal restraint" in coordinating international energy agreements.[1]

3. On April 8, 2025, President Trump issued E.O. 14260, directing the U.S. Department of Justice (DOJ) to identify and take all appropriate action to halt unconstitutional "burdensome and ideologically motivated 'climate change' or energy policies," including those involving "environmental justice," "greenhouse gas" emissions, and "'environmental, social, and governance' initiatives."[2]

4. On December 11, 2025, President Trump issued E.O. 14366, directing the Chairman of the Securities and Exchange Commission (SEC) to review, and as appropriate, rescind rules or regulations implicating "'environmental, social, and governance' (ESG) priorities."[3]

5. On January 7, 2026, President Trump announced that the U.S. would withdraw from 66 global organizations deemed "contrary to the interests of the

---

[1] E.O. 14162, *Putting America First in International Environmental Agreements* (Jan. 20, 2025), available here.

[2] E.O. 14260, *Protecting American Energy from State Overreach* (Apr. 8, 2025), available here.

[3] E.O. 14366, *Protecting American Investors from Foreign-Owned and Politically-Motivated Proxy Advisors* (Dec. 11, 2025), available here.

United States," including the "24/7 Carbon-Free Energy Compact," the "Commission for Environmental Cooperation," the "Intergovernmental Panel on Climate Change," and the "UN Framework Convention on Climate Change."[4]

6. President Trump's cabinet officials, including Defendant Secretary Rollins, have voiced similarly strong critiques of ESG. For example, on May 13, 2026, Secretary Rollins posted on X that "ESG MANDATES have no place in American agriculture. Dairies shouldn't be forced to bend the knee to radical ESG demands pushed for ideological reasons…. We should keep activist agendas out of our farms."[5]

7. Despite this administration's speech—uniformly critical of ESG's legitimacy within regulatory frameworks forced upon American citizens and businesses—ESG mandates remain firmly in place in American agriculture. American dairy farmers are required to pay "checkoff" fees for each hundredweight (100 pounds) of milk they produce. In turn, these mandatory checkoff fees subsidize private organizations that promote an ESG-focused ideological agenda around the world. These organizations, with the assistance of USDA, then impose their ESG demands upon the very American farmers funding them back home.

8. Decades ago, some such "checkoff"-funded promotions were broadly deemed "government speech," following a U.S. Supreme Court ruling in which the challenged message of the beef checkoff program "from beginning to end" was "the

---

[4] See *Memorandum, Withdrawing the United States from International Organizations, Conventions, and Treaties that are Contrary to the Interests of the United States*, THE WHITE HOUSE (Jan. 7, 2026), available here.

[5] Secretary Brooke Rollins, X.COM (May 13, 2026, 1:45 PM), available here.

message established by the Federal government," and in which "the Secretary exercises final approval authority over every word used in every promotional campaign." *See Johanns v. Livestock Mkting. Ass'n*, 544 U.S. 550, 560-61 (2005). Also in that program, "[a]ll proposed promotional messages" were "reviewed by Department officials both for substance and for wording." *See id.* at 561.

9. Such a simplistic arrangement does not describe today's bloated Dairy Checkoff labyrinth, which includes initiatives advancing an ESG-focused ideological agenda not germane to the regulatory interests set forth in the Dairy Act. Even if it once were the case, no longer does a discrete list of entities simply support USDA in advertising and promoting milk sales, such that any such initiatives may fairly be characterized as an extension of USDA and be deemed government speech.

10. Nor *could* any such ESG-focused initiatives be government speech—as Congress requires that Dairy Checkoff funds be used for the advertisement and promotion of dairy product sale and consumption, and research related only to such advertisement and promotion.

11. Thus, at best, the use of such funds to advance an ESG-focused ideological agenda promotes an unrelated message—that dairy farmers must take steps to combat climate change, including through prioritizing the reduction of greenhouse gas emissions. At worst, the use of such funds actually promotes the *opposite* message—that the dairy industry is harming the environment.

12. In short, while some Dairy Checkoff promotions may still be classified as "government speech" in advancing the regulatory interests set forth in the Dairy

- 4 -

Act, a growing presence of private, ideological messaging not germane to those interests has infiltrated the Dairy Checkoff. As a result, the Dairy Checkoff is at most now a hybrid between "government speech" germane to the regulatory interests prescribed by the Dairy Act, and private speech that is not.

13. Such private, ESG-focused speech cannot simply "become" government speech by labeling it so, as "[t]he First Amendment is no word game." *Chiles v. Salazar*, 146 S. Ct. 1010, 1023 (2026). Such an egregious weaponization of the Dairy Checkoff by private actors harms American dairy farmers, including in Wisconsin.

14. Abby Swan, Adam Faust, and Christopher Baird, each of whom are Wisconsin dairy farmers subject to and harmed by the Dairy Checkoff program, bring this action to obtain a declaration that the Dairy Checkoff is unconstitutional under the First Amendment as a compelled subsidy of private speech to the extent it funds the Innovation Center, a declaration that Defendants' actions are contrary to the Dairy Act and exceed the authority Congress granted to USDA in the Dairy Act, and an injunction barring its enforcement against Plaintiffs.

## PARTIES

15. Plaintiff Abby Swan is a dairy farmer from Westfield, Wisconsin. After working in the medical field for over 20 years, including as an Emergency Department registered nurse, Ms. Swan is proud to now work full-time on her family's dairy farm of approximately 800 cows, and where they currently milk approximately 320 of those cows. Plaintiff Swan's family farm is subject to the Dairy Checkoff program.

16. Plaintiff Adam Faust is a dairy farmer from Chilton, Wisconsin. He is a double amputee who milks 70 Holstein cows and farms 200 acres to feed those cows. Plaintiff Faust's farm is subject to the Dairy Checkoff program.

17. Plaintiff Christopher Baird is a dairy farmer from Ferryville, Wisconsin. Just ten miles from the Mississippi River, Mr. Baird milks over 50 Jersey cows and farms approximately 80 acres. Plaintiff Baird's farm is subject to the Dairy Checkoff program.

18. Defendant Brooke Rollins is the U.S. Secretary of Agriculture. As Secretary of Agriculture, Defendant Rollins oversees USDA and has authority to issue an order creating the governing board to administer the Dairy Checkoff program. She is sued in her official capacity.

19. Defendant National Dairy Promotion and Research Board is the governing board that USDA designates to administer the Dairy Checkoff program.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

21. This Court has authority to issue a declaratory judgment, order injunctive relief, and order other relief that is necessary and proper, pursuant to 28 U.S.C. §§ 2201 and 2202.

22. Venue is appropriate in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims has

occurred in this district, as multiple Plaintiffs reside and maintain their respective dairy farms subject to the Dairy Checkoff program in this district.

## STATEMENT OF FACTS

23. The Dairy Promotion Stabilization Act of 1983, 7 U.S.C. § 4501 *et seq.* (the "Dairy Act"), authorizes "a coordinated program of promotion designed to strengthen the dairy industry's position in the marketplace and to maintain and expand domestic and foreign markets and uses for fluid milk and dairy products." *See* 7 U.S.C. § 4501(b).

24. Pursuant to the Dairy Act, the Secretary of the Department of Agriculture (the "Secretary") is authorized to issue an order "for the establishment and administration of appropriate plans or projects for advertisement and promotion of the sale and consumption of dairy products, for research projects related thereto, for nutrition education projects, and for the disbursement of necessary funds for such purposes." 7 U.S.C. § 4504(a); *see also* 7 C.F.R. § 1150 *et seq.* (the "order" or "Dairy Order," the USDA regulation implementing the Dairy Act).

25. The term "promotion" in the Dairy Act is defined as "actions such as paid advertising, sales promotion, and publicity to advance the image and sales of and demand for dairy products." 7 U.S.C. § 4502(i).

26. The term "research" in the Dairy Act is defined as "studies testing the effectiveness of market development and promotion efforts, studies relating to the nutritional value of milk and dairy products, and other related efforts to expand demand for milk and dairy products." 7 U.S.C. § 4502(j).

27. The Dairy Act provides that advertisement and promotion programs administered through the Dairy Order are financed "through assessments on all milk produced in the United States for commercial use and on imported dairy products." 7 U.S.C. § 4501(b).

28. The Dairy Act requires that these assessments "shall be used for payment of the expenses in administering" the Dairy Order. 7 U.S.C. § 4504(g)(2).

29. Currently, milk producers are required to pay 15 cents per hundredweight of milk and importers 7.5 cents per hundredweight of milk. 7 U.S.C. § 4504(g) (hereinafter the "Dairy Checkoff").

30. The Dairy Act provides for the establishment of the National Dairy Promotion and Research Board (the "Dairy Board"), whose members are either appointed or authorized by the Secretary. *See* 7 U.S.C. § 4504(b)(2).

31. Pursuant to the Dairy Act, the Dairy Board, with the approval of the Secretary, may enter into agreements for the development and conduct of activities authorized by the Dairy Order, as well as the payment of the cost thereof with funds collected through the Dairy Checkoff. *See* 7 U.S.C. § 4504(f); *see also* 7 C.F.R. § 1150.140.

32. Effective January 1, 1995, with USDA approval, the Dairy Board and the United Dairy Industry Association (UDIA) formed Dairy Management, Inc. ("DMI"), a non-governmental "organization responsible for increasing demand for U.S.-produced dairy products on behalf of America's farmers."[6]

---

[6] *History*, U.S. DAIRY (last accessed May 28, 2026), available here.

33. With USDA approval, DMI directs and manages the Dairy Checkoff.

34. In doing so, DMI works with qualifying state and regional organizations to manage the Dairy Checkoff, including Dairy Farmers of Wisconsin ("DFW").

35. DFW collects the Dairy Checkoff funds from Wisconsin dairy farmers, including from Plaintiffs. While a portion of those funds remains with DFW to promote Wisconsin dairy, a portion is transferred to DMI to fund DMI initiatives.

36. Wisconsin dairy farmers—like all dairy farmers and importers—are required to participate in the Dairy Checkoff. Neither the Dairy Act, nor the Dairy Order implementing the Dairy Act, provide a mechanism for individual farmers to "opt out" or otherwise withhold Dairy Checkoff contributions, or to object to specific messaging or promotions funded by the Dairy Checkoff.

37. Violations by farmers of the Dairy Checkoff may be subject to a $1,000 fine for each violation, penalties, including a civil enforcement action and restraining order, and administrative investigation and enforcement by USDA. *See* 7 U.S.C. §§ 4510, 4511.

38. Importantly, "no funds collected" by the Dairy Board, as carried out through DMI in working with qualifying organizations, "shall in any manner be used for the purpose of influencing governmental policy or action," aside from recommending to the Secretary proposed amendments to the Dairy Order. *See* 7 C.F.R. §1150.154.

- 9 -

39. According to USDA's most recent published report, Dairy Checkoff contributions from milk producers and importers totaled over $350 million.[7]

40. In carrying out projects with these hundreds of millions of dollars from farmers paying their Dairy Checkoff contributions, DMI collaborates with various private organizations.

41. One such organization is the Innovation Center for U.S. Dairy ("the Innovation Center"), a private, 501(c)(6) entity founded in 2008.

42. Since the inception of the Innovation Center, "dairy farmers and importers have primarily funded" its "efforts through Dairy Management Inc. and the national checkoff program. Dairy companies and others contribute financially to specific programs and initiatives that advance shared industry goals."[8]

43. The Innovation Center describes itself as "an organization that works with leaders from across the dairy value chain to align on precompetitive priorities, drive progress and speak with one voice."[9]

44. The stated purpose of the Innovation Center is to "unite[ ] leaders across the entire dairy value chain—including farmers, processors, cooperatives, and

---

[7] This data is from 2023. USDA is required to annually publish its report to Congress, but has not yet published its 2024 or 2025 reports. *See* Report to Congress on Dairy & Fluid Milk Promotion & Research Programs, USDA (last accessed May 20, 2026), available here.

[8] *About Us*, THE INNOVATION CTR. FOR U.S. DAIRY (last accessed May 27, 2026), available here.

[9] *See id.*

retailers—to work together on precompetitive priorities that build a stronger, more trusted dairy sector."[10]

45.	One of these four "precompetitive priorities" is to "Regenerate the Environment," described as "amplify[ing] U.S. dairy's ongoing commitment to environmental progress by scaling regenerative solutions that sustain farms, communities, and the planet." Another priority, the "U.S. Dairy Stewardship Commitment," is described as "demonstrat[ing] sustainability progress through aligned action and reporting as an industry."[11]

46.	None of the four listed "Priorities" describes the advertising or promoting of U.S. dairy sales.

47.	Relatedly, under these "Priorities," the Innovation Center's website lists "focus areas," described as "shared priorities" to "achieve the U.S. dairy community's vision of transformative good." One such priority is "environmental stewardship," citing GHG emission statistics and celebrating that "farmers are producing more milk using fewer resources."[12]

48.	The Innovation Center admits it "cannot" and states that it does "not seek to influence governmental policy or action."[13]

---

[10] INNOVATION CTR. FOR U.S. DAIRY (last accessed May 27, 2026), available here.

[11] *See id.*

[12] *See id.*

[13] *See 2025 U.S. Dairy Materiality Assessment Report*, INNOVATION CTR. FOR U.S. DAIRY (last accessed May 28, 2026), available here.

49. Yet in 2009, and pursuant to 7 U.S.C. § 3101 *et seq.*, which governs agricultural research generally, USDA and the Innovation Center entered into a Memorandum of Understanding ("MOU").[14]

50. The MOU explains that DMI launched a "dairy sustainability initiative," and that through the Innovation Center, "leaders from approximately 80 percent of the dairy supply chain – including dairy farmers, cooperatives and associations, processors, manufacturers and brands – have endorsed the Commitment." The MOU does not define the "Commitment."

51. To carry out this initiative in partnership with the Innovation Center, the MOU explains that USDA may take the following actions:

(1) "Assist[] the Innovation Center" in "its goal of reducing the United States dairy industry's greenhouse gas emissions by 25 percent by the year 2020";

(2) "Accelerate and streamline the process for adopting anaerobic digesters by the United States dairy farmer operators";

(3) "Support the promotion and implementation of energy audits targeting the dairy sector";

(4) "Accelerate the adoption and technology transfer of new and existing manure management strategies";

(5) "Develop[] research initiatives to further assist in reducing environmental impacts";

---

[14] *Memorandum of Understanding Between USDA and the Innovation Center for U.S. Dairy* (Dec. 15, 2009), available here.

(6) "Leverage the U.S. Dairy Forage Research Center and Institute for Environmentally Integrated Dairy Management" and "orient" its initiatives "with emerging science associated with greenhouse reduction goals";

(7) "Provide[] a single national point of contact for coordinating USDA agencies and services relating to greenhouse emissions associated with dairy production and research on greenhouse gas issues and science";

(8) "Assess[] the feasibility of establishing an agency liaison" with DMI and the Innovation Center; and

(9) "Coordinate a nationwide multi-stakeholder meeting for that [sic] will bring together the entire value chain to identify and create opportunities for the dairy industry to reduce environmental impacts while creating business and social value."

52.     The MOU clarifies that any "[s]pecific work or projects that involve the transfer of funds, services, or property among the Parties . . . must be independently authorized by appropriate statutory authority."

53.     USDA entered into this agreement despite the Dairy Act mandating that Dairy Checkoff funds "shall be used" for the "advertisement and promotion of the sale and consumption of dairy products" and "for research projects related thereto." *See* 7 U.S.C. § 4504(a).

54.     As one example of Innovation Center and USDA collaboration, the Innovation Center "supported" research co-led by USDA to answer the question posed

in its 2021 article: "Will Removing Dairy Cows Help Stop Climate Change?"[15] In other words, America's dairy farmers funded research to study hypothetically eliminating their livelihood.

55. The MOU has been amended from time to time, and upon information and belief, most recently in 2022 (the "2022 MOU Amendment").

56. In the Innovation Center's press release noting (but not publishing) the 2022 MOU Amendment, USDA and the Innovation Center declared that their MOU "extends and builds upon a pact originally signed in 2009" in order "to continue working toward the dairy industry's 2050 environmental stewardship goals while addressing growing consumer demand for food that is produced in a way that's good for the planet."[16]

57. In that same press release, then-Deputy Secretary of USDA explained: "In renewing this agreement with the Innovation Center for U.S. Dairy, USDA is recommitting to our vital work with dairy farmers to reduce methane emissions and improve the sustainability of their operations."

58. Also in that press release, the Innovation Center explained that the 2022 MOU Amendment focuses on efforts that "will accelerate and streamline programs focused on resource recovery, sustainability improvement, soil health management and greenhouse gas reduction (GHG)."

---

[15] *Cows and Climate Change*, INNOVATION CTR. FOR U.S. DAIRY (Feb. 3, 2021), available here.

[16] *See* Press Release, *USDA, Innovation Center Sign MOU to Continue Sustainability Commitment*, INNOVATION CTR. FOR U.S. DAIRY (June 16, 2022), available here.

59.     USDA entered into the 2022 MOU Amendment, despite the Dairy Act providing that checkoff funds "shall be used" to administer the Dairy Order, and only for projects relating to the "advertisement and promotion of the sale and consumption of dairy products" and "for research projects related thereto." *See* 7 U.S.C. § 4504(a).

60.     The "2050 environmental stewardship goals" and the "Commitment" referenced in the 2022 MOU Amendment are, upon information and belief, references to the "U.S. Dairy Stewardship Commitment" (hereinafter the "Stewardship Commitment"), an initiative launched in 2020 by the Innovation Center.

61.     Pursuant to the Stewardship Commitment, the Innovation Center works with other organizations to promote ESG through various initiatives.

62.     A 2021 resource document, published just one year into this initiative, describes the Stewardship Commitment as a "voluntary, stakeholder-aligned initiative to advance sustainability leadership across the dairy community," in "reflect[ing] a shared belief that social responsibility is larger than any single organization or supply chain."[17]

63.     This same document admits that the Stewardship Commitment is not designed to market or sell dairy products, but instead, to "advance U.S. dairy's role in building a sustainable future."[18]

64.     The document also references the Innovation Center's "Dairy Sustainability Alliance," a professional organization carrying out the Stewardship

---

[17] *U.S. Dairy Stewardship Commitment*, INNOVATION CTR. FOR U.S. DAIRY (Nov. 2021), available here.

[18] *See id.*

Commitment. The Dairy Sustainability Alliance includes 350 industry professionals, although a mere 40 dairy farmer representatives. All Dairy Sustainability Alliance members "commit to advance socially responsible, economically viable and environmentally sound dairy food systems."[19]

65. The Stewardship Commitment document has been periodically updated. The 2026 Stewardship Commitment document states that as of July 2025, companies representing more than 77% of milk production have adopted the Stewardship Commitment.[20]

66. The Stewardship Commitment is embedded with multiple other dairy organizations, all of which also engage with the Innovation Center, according to the Innovation Center's current online resource guide for dairy processors:

---

[19] *See id.*

[20] *U.S. Dairy Stewardship Commitment Handbook*, INNOVATION CTR. FOR U.S. DAIRY (Jan. 2026), available here.



**Making Industry Connections**

Since 2008, the U.S. dairy community — dairy farmers, companies and key stakeholders — has worked together pre-competitively to advance a shared social responsibility platform. Numerous working groups and programs are available to assist dairy companies at all stages of their sustainability journey. To learn more, contact Jennifer Block at Stewardship.Commitment@dairy.org.

- Dairy Sustainability Alliance®: A multi-stakeholder group of more than 165 member organizations Members convene to collaborate on issues affecting the industry at large, accelerate progress toward common sustainability goals and contribute to the long-term viability of the U.S. dairy industry.
- The National Dairy Farmers Assuring Responsible Management (FARM) Program: Has established a rigorous framework of best practices to show customers and consumers that the dairy industry holds itself to the highest standards. The program has four silos: Animal Care; Environmental Stewardship; Antibiotic Stewardship; and Workforce Development.
- **Processor Working Group:** More than 50 participants representing more than 25 processing organizations, this group is engaged in facility-focused workstreams for waste, water, packaging and greenhouse gas emissions to drive action and demonstrate progress toward the goals.
- Dairy Stewardship Commitment: Adopters of the U.S. Dairy Stewardship Commitment represent nearly 3/4 of U.S. milk production. These 34 cooperatives and processors have taken the voluntary pledge to demonstrate positive impacts in environmental sustainability, animal welfare, community contributions and food safety.
- U.S. Dairy Net Zero Initiative (NZI): NZI is a collaboration of dairy organizations to advance research, on-farm pilots and new market development to make sustainability practices more accessible and affordable to farms of all sizes — an essential first phase to accelerate progress toward the 2050 goals.
- **Traceability:** Is the ability to track a product through all stages of production, processing and distribution. The U.S. Dairy Traceability Guidance focuses on product flows, labeling, recordkeeping, data collection and other protocols from the plant to the supply chain to end-product manufacturers. This guidance document and checklist contains information needed to implement traceability standards at your company.
- **IDFA People First:** IDFA's People Strategy focuses on ensuring dairy companies have the knowledge, tools and talent to succeed in a more competitive, diverse and inclusive future.

67. One such initiative on that list, the "U.S. Dairy Net Zero Initiative" (NZI), was "launched in 2020 as an industry-wide effort to *accelerate voluntary action* on farm [sic] to reduce environmental impacts."[21] Specifically, NZI was established by the Innovation Center, in partnership with several other dairy organizations.

68. In announcing the establishment of NZI, then-chairman of the Innovation Center explained that "we're leveraging U.S. dairy's innovation, diversity and scale to drive continued environmental progress and create a more sustainable planet for future generations."[22]

---

[21] *U.S. Dairy Net Zero Initiative,* USDAIRY.COM (Aug. 2022), available here.

[22] *U.S. Dairy Advances Journey to Net Zero Carbon Emissions by 2050*, NESTLÉ (Oct. 12, 2020), available here.

69. NZI is the stated "pathway" to advance the Stewardship Commitment goals set by the Innovation Center, with these goals approved by the Innovation Center's Board of Directors.

70. NZI has received substantial corporate investment since its inception, including $10 million from Nestlé in 2020 and $10 million from Starbucks in 2021.[23] As of 2024, NZI has leveraged more than $40 million from partners and grants.[24]

71. In turn, those who support NZI and other Innovation Center-driven ESG initiatives expect to see their dreams come to life. For example, at a 2022 "sustainability conference" in Washington, D.C., Dairy Export Council President and CEO admitted that "when someone is investing millions of dollars in our process, they want to see results."[25]

72. Put differently, the Dairy Checkoff-funded private entities like the Innovation Center, which advance the Stewardship Commitment and NZI, aim to deliver "results" to companies that give them tens of millions of dollars to enact their sustainability-related initiatives and effectively generate new USDA-funded policy.

73. To deliver these results, private entities like the Innovation Center rely upon government resources and like-minded policymakers—despite being statutorily prohibited from using Dairy Checkoff funds to influence government policy.

---

[23] *See Starbucks, Nestlé Delivering Dairy's Sustainability Story*, DAIRY MGMT., INC. (June 23, 2023), available here.

[24] Karen Scanlon, *Reflecting on 3 years of progress: The U.S. Dairy Net Zero Initiative*, TRELLIS (updated July 24, 2024), available here.

[25] *The Need for More Dairy Sustainability Partnerships*, U.S. DAIRY EXPORT COUNCIL (June 9, 2022), available here.

- 18 -

74. For example, in the same set of remarks, the same CEO admitted that what the dairy industry "needs most from the government" are "groundbreaking resources done in a precompetitive way." In other words, the dairy industry inevitably "needs" government to advance "precompetitive" policies.[26]

75. The current MOU between USDA and the Innovation Center does exactly that—USDA "assists" the Innovation Center in reaching its climate goals and carrying out its ideological agenda. *See supra* ¶ 51.

76. But notably, the Innovation Center and its web of ESG-focused initiatives do not limit their ideological agenda to the United States. Instead, the Innovation Center partners with international partners in various projects.

77. For example, the Innovation Center co-leads the "Greener Cattle Initiative," which includes the New Zealand-based entity Foundation for Food & Agriculture Research (FFAR) and corporations such as Nestlé, JBS USA, Elanco, and Genus PLC. Focusing on GHG emissions, the Greener Cattle Initiative has awarded nearly $10 million since its launch. For example, in a 2024 request for proposals, the Greener Cattle Initiative warned that "enteric methane," which cows "release into the atmosphere by burping or exhaling," is a "significant source" of GHG emissions.[27]

---

[26] *See id.*

[27] *About the Greener Cattle Initiative*, FOUND. FOR FOOD & AGRIC. RESEARCH (last accessed May 27, 2026), available here.

78. The Innovation Center's 2026 Stewardship Commitment Handbook also expands on how the Innovation Center upholds "globally recognized best practices and guidance protocols for development of sustainability and reporting standards."[28]

79. For example, the Innovation Center is also among the list of supporters[29] for the global "Pathways to Dairy Net Zero" initiative (distinct from NZI, the apparent U.S. domestic "pathway").

80. The global Pathways to Dairy Net Zero ("Pathways to DNZ") was launched in 2021, "during Climate Week and just prior to the United Nations (UN) Food Systems Summit," and holds itself out to be a "growing movement . . . dedicated to reducing dairy's greenhouse gas (GHG) emissions over the next 30 years."[30]

81. When Pathways to DNZ launched, then-Secretary of Agriculture Vilsack announced USDA's support while attending the 2021 United Nations Climate Change Conference of the Parties in Scotland, stating: "Livestock, including dairy, can provide critical climate solutions . . . . Increasing the rate of adoption of feed management, manure management and digesters will be key to reducing greenhouse gas emissions including methane."[31]

---

[28] *See supra* n. 19.

[29] *Meet our Supporters*, PATHWAYS TO DAIRY NET ZERO (last accessed May 27, 2026), available here.

[30] *About the Initiative*, PATHWAYS TO DAIRY NET ZERO (last accessed May 27, 2026), available here.

[31] Press Release, *USDA Underscores Commitment to Climate Action at COP26*, USDA (Nov. 5, 2021), available here.

82. To be a supporter of Pathways to DNZ, the Innovation Center (and numerous other organizations) must endorse messages such as: "reducing methane emissions from livestock must be part of a climate solution," that the dairy industry "has the means to reduce a significant proportion of emissions by improving productivity and resource-use efficiency,"[32] among committing to six core principles[33]:



83. Not one of these six principles spotlights the marketing or advertising of U.S. dairy products, but instead, solely focuses on the global "dairy sector's climate ambition."

84. In addition to these aforementioned global initiatives, the Innovation Center aggregates worldwide data relating to sustainability through the Dairy Sustainability Framework, which "connects dairy sustainability efforts worldwide"

---

[32] *Sign the Declaration*, PATHWAYS TO DAIRY NET ZERO (last accessed May 27, 2026), available here.

[33] *See supra* n. 29.

and "ensur[es] that all U.S. dairy companies adopting the Commitment are recognized globally."[34]

85. In addition, the Stewardship Commitment requires participation in a separate Farmers Assuring Responsible Management (FARM) "Environmental Stewardship" program ("FARM ES"), which is also connected to the Innovation Center.[35]

86. FARM ES is formally managed as a partnership between DMI and the National Milk Producers Federation (NMPF), and its data is used by dairy cooperatives and processors for reporting emissions to dairy buyers.

87. The Innovation Center uses ("FARM ES") as a "sustainability tool" that assesses, among other things, farm-level GHG emissions. In such assessments, individual American dairy farms have been asked to provide a list of data relating to their farms, on issues ranging from herd size, to the time spent milking cows, to farm energy use (including the specific type of lightbulbs used) to "nutrition" and "cow comfort."[36]

88. While participation by individual farmers in FARM ES is described as "voluntary," as of 2024, 44 organizations representing 80% of the milk supply nationwide participate. Such buyers require that aggregated farm-level data in order

---

[34] *See supra* n. 19.

[35] *See id.*

[36] *FARM Environmental Stewardship*, FARMERS ASSURING RESPONSIBLE MGMT. (last accessed May 27, 2026), available here.

to enhance their "public commitments to reduce the environmental footprint of their products."[37]

89. Thus, as a practical matter, participation is not voluntary if farmers want to sell their milk to processors that ultimately serve most milk buyers.

90. The NMPF, which co-leads FARM ES along with DMI, holds itself out publicly to be "the voice of dairy farmers in our nation's capital" and spent over $799,000 on lobbying expenditures in 2025.[38] Among other things, the NMPF has publicly supported federal legislation aligned with its sustainability goals,[39] and encourages "climate-friendly investments among dairy farmers" to "aid the entire industry in its goal of net-zero emissions by 2050."[40]

91. Thus, participation in FARM ES, NZI, and other private organizations related to the Innovation Center generates a circular, self-fulfilling prophecy. By using farmers' money to apply pressure on milk processors to agree to "voluntary" ESG principles, farmers are then forced to comply with this ESG ideological agenda in order to sell their milk to such processors. Caught in this circular commitment, dairy farmers are first forced to subsidize the messaging with which they disagree, then forced to comply with additional, burdensome demands after the message has been adopted.

---

[37] *See id.*

[38] *National Milk Producers Federation*, OPENSECRETS.ORG (last accessed May 27, 2026), available here.

[39] *Climate Policy*, NAT'L MILK PRODS. FED'N (last accessed May 28, 2026), available here.

[40] *See id.*

92. The online "Resource Guide" co-published by the Innovation Center and the International Dairy Foods Association fully admits to this exact phenomenon, stating that by participating in the Stewardship Commitment, "food companies and other dairy buyers are encouraging, and in many cases requiring as a condition of sale, that their suppliers demonstrate a commitment to ESG."[41]

93. Plaintiff Swan was faced with this harsh reality in February 2026, when she received both a letter from her milk processing plant and an unannounced phone call, referencing "voluntary" data collection. The intrusive, "voluntary" collections included all energy data for one year, including electricity, natural gas, and propane, all herd data, including the average weight of milk cattle and the price paid for cattle, all nutrition data, among more categories, requiring several hours of Plaintiff Swan's time to complete. However, it was necessary for her to provide all such data in order to sell the milk from her family farm.

94. All three Plaintiffs anticipate being burdened with additional such collection tasks imminently. Plaintiffs believe that the results drawn from such data collections hurt small farms like their own—where, for example, the total carbon footprint by small family farms is more thoroughly captured by the assessment than a large farm. In other words, not only do Plaintiffs believe that the "voluntary" data collection imposes undue burdens on their limited time and resources, but the

---

[41] *Sustainability Resource Guide for U.S. Dairy Processors*, INNOVATION CTR. FOR U.S. DAIRY & INT'L DAIRY FOODS ASS'N (last accessed May 28, 2026), available here.

underlying ESG agenda unfairly targeting small farms certainly does not speak for them.

95.     Defendant Rollins recently admitted to this harm and the targeting of small farms, critiquing "radical ESG demands disguised as sustainability" on X and calling out Pathways to DNZ as "burden[ing] small farms with costly compliance."[42]

96.     Even worse, despite imposing these mandates on small farms, the Innovation Center has long admitted that "producing dairy has a surprisingly small impact on the environment," with a 2008 study indicating that dairy production accounts for only 2 percent of total U.S. GHG emissions and a 2017 study indicating that the environmental impact of milk production shrunk "significantly" since then.[43]

97.     But with its goal of "zero" net emissions by 2050, the Innovation Center has commanded that "we're not stopping there." Instead, states the Innovation Center, "we're seizing the moment to address methane from cow burps and manure to gain significant climate benefits."[44] And while the Innovation Center refers to "we," it is ultimately America's farmers who are compelled to subsidize that message—and then bring that message to life by complying with ESG mandates not germane to the Dairy Act's prescribed purposes for that subsidy.

98.     Indeed, small farms are burdened with these compliance costs at a time when many dairy farms are already struggling. As of early 2026, approximately 5,100

---

[42] *See supra* ¶ 6.

[43] *Environmental Impact of Dairy Farming*, INNOVATION CTR. FOR U.S. DAIRY (last accessed May 29, 2026), available here.

[44] *See id.*

- 25 -

dairy herds operate in Wisconsin—just over half of the number of farms operating in the state 10 years ago, and approximately 1/3 of the number of farms operating 20 years ago.[45]

## CAUSES OF ACTION

## CLAIM ONE

**Violation of the First Amendment to the United States Constitution – Speech Clause**

99. Plaintiffs reallege and incorporate by reference all preceding allegations of the Complaint.

100. The Dairy Act mandates that Dairy Checkoff funds be used "for the establishment and administration of appropriate plans or projects for advertisement and promotion of the sale and consumption of dairy products, for research projects related thereto." 7 U.S.C. § 4504(a).

101. Dairy Checkoff funds support private organizations, such as the Innovation Center, which collaborate with other ESG-focused entities and advance projects such as NZI, Pathways to DNZ, and FARM ES, to achieve its missions.

102. A primary mission of the Innovation Center is to reduce GHG emissions in the dairy industry and specifically, to achieve GHG neutrality by 2050. The message promoting that as a primary goal of the dairy industry is, at best, neutral but not germane to the regulatory interests prescribed for Dairy Checkoff fund use.

---

[45] Hope Kirwan, *Wisconsin has its fewest dairy herds in decades—and about the same number of cows*, WIS. PUB. RADIO (Jan. 19, 2026), available here.

At worst, the message directly opposes those interests by accusing the dairy industry of harming the environment.

103. Thus, the Dairy Checkoff is currently being administered contrary to federal law. By supporting the Innovation Center, Dairy Checkoff funds are not being solely used for "plans or projects for advertisement and promotion of the sale and consumption of dairy products" and "for research projects related thereto."

104. Instead, Defendants are permitting the Innovation Center to use Dairy Checkoff funds to advance its ESG-focused ideological agenda.

105. Even worse, in doing so, the Innovation Center is acting contrary to federal law in ultimately seeking to influence public policy.

106. The ESG-related initiatives advanced by the Innovation Center are not germane to the regulatory interests set forth in the Dairy Act as appropriate for Dairy Checkoff fund expenditure.

107. Plaintiffs disagree with the ESG-focused messaging and priorities as advanced by the Innovation Center, including through NZI, Pathways to DNZ, and FARM ES, which Plaintiffs are funding through their Dairy Checkoff contributions. For example, Plaintiffs disagree with the statements that reducing GHG emissions is—and should be—a top priority of the dairy industry, or that "reducing methane emissions from livestock must be part of a climate solution." *See, e.g., supra* ¶ 82. At a minimum, Plaintiffs wish to remain silent on issues, such as ESG, which are unrelated to selling and promoting the milk produced on their small dairy farms.

108. Plaintiffs would not choose to subsidize or otherwise express these ESG-focused messages if not for being compelled to do so through the Dairy Checkoff.

109. Nevertheless, Plaintiffs are required by federal law to subsidize the Dairy Checkoff, and they have no ability to "opt out" or otherwise not subsidize it.

110. Each Plaintiff has been compelled—and expect to continue to be compelled—to subsidize the Dairy Checkoff each year, in varying amounts up to approximately $12,000, from the milk produced on their respective dairy farms.

111. However, "the compelled subsidization of private speech" Plaintiffs are experiencing "seriously impinges on First Amendment rights" and "cannot be casually allowed." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 894 (2018). The U.S. Supreme Court has repeatedly held that "freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Id.* at 892 (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). "When government officials compel individuals 'to mouth support for views they find objectionable,' they violate this 'cardinal constitutional command.'" *Kilborn v. Amiridis*, 131 F.4th 550, 562 (7th Cir. 2025) (quoting *Janus*, 585 U.S. at 892).

112. Without satisfying exacting scrutiny, at a minimum, government-compelled subsidy of the speech of a private entity is unconstitutional under the First Amendment.

113. Defendants have not provided a sufficient governmental interest that may justify the compelled subsidy of a private, ESG-focused ideological agenda. In

fact, the Government has spoken out *against* that exact agenda being advanced through the compelled subsidy. *See supra* ¶¶ 2–6.

114. In addition, Plaintiffs have not waived their First Amendment rights, such that this infringement may otherwise be justifiable. *See Richwine v. Matuszak*, 148 F.4th 942, 948 (7th Cir. 2025) ("A waiver of First Amendment rights 'must be freely given and shown by clear and compelling evidence.'") (*quoting Janus*, 585 U.S. at 930) (internal quotation omitted).

115. Thus, the Dairy Checkoff is unconstitutional, in violation of the First Amendment, to the extent it forces Plaintiffs to subsidize the speech of the Innovation Center, promoting ESG as a top priority of the dairy industry.

## CLAIM TWO

**Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C) – Agency Action Exceeding Congressional Authority**

116. Plaintiffs reallege and incorporate by reference all preceding allegations of the Complaint.

117. Under APA review, courts must decide "whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). This APA review includes the duty to "fix[ ] the boundaries of the delegated authority," *id.* at 371, and "police [those] outer statutory boundaries," *id.* at 404.

118. The Dairy Act mandates that Dairy Checkoff funds be used "for the establishment and administration of appropriate plans or projects for advertisement and promotion of the sale and consumption of dairy products, for research projects related thereto." 7 U.S.C. § 4504(a).

119. The Dairy Act does not contemplate using Dairy Checkoff funds for purposes other than "appropriate plans or projects for advertisement and promotion of the sale and consumption" of dairy products, and related research. *See id.*

120. As a result, by permitting Dairy Checkoff funds to support the Innovation Center, whose ESG-focused mission is, at best, unrelated to such purposes, Defendants are acting outside of the authority granted to them by Congress and contrary to law.

121. Plaintiffs have no adequate remedy at law for these violations.

122. Defendants' actions are therefore "not in accordance with law." 5 U.S.C. § 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Accordingly, this Court should hold such actions unlawful and set them aside.

## CLAIM THREE

### Administrative Procedure Act, 5 U.S.C. § 706(2)(B) – Agency Action In Violation of Constitutional Rights

123. Plaintiffs reallege and incorporate by reference all preceding allegations of the Complaint.

124. The APA makes clear that courts must hold unlawful and set aside agency actions found to be "contrary to [a] constitutional right." 5 U.S.C. § 706(2)(B).

125. The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const., amend. I.

126. The "freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus*, 585 U.S. at 892 (quoting *Wooley*, 430

U.S. at 714). "When government officials compel individuals 'to mouth support for views they find objectionable,' they violate this 'cardinal constitutional command.'" *Kilborn*, 131 F.4th 562 (quoting *Janus*, 585 U.S. at 892).

127. As explained previously, the Dairy Checkoff program compels Plaintiffs to subsidize private speech—particularly, the ESG ideological agenda advanced by the Innovation Center and related entities. *See generally supra.*

128. This compelled subsidization of private speech violates the First Amendment rights of Plaintiffs.

129. Plaintiffs have no adequate remedy at law.

130. Such agency actions therefore violate the APA because they are "contrary to constitutional right." 5 U.S.C. § 706(2)(B). Accordingly, this Court should hold them unlawful and set them aside.

### CLAIM FOUR

**Administrative Procedure Act, 5 U.S.C. § 706(2)(B) – Agency Action In Violation of Separation of Powers**

131. Plaintiffs reallege and incorporate by reference all preceding allegations of the Complaint.

132. The APA makes clear that courts must hold unlawful and set aside agency actions found to be "contrary to constitutional . . . power." 5 U.S.C. § 706(2)(B).

133. The U.S. Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const., art. I, § 1.

- 31 -

134. The U.S. Constitution further provides: "[The President] shall take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3.

135. An "agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). When an agency acts, it must point to "clear congressional authorization." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022).

136. In *West Virginia v. EPA*, the U.S. Supreme Court explained that it "expect[s] Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." 597 U.S. at 716 (citation omitted). The Court presumes that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id*. at 723 (citation omitted). A federal agency must be able to point to "'clear congressional authorization' for the power it claims." *See id*. (quoting *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

137. In the Dairy Act, Congress did not permit Dairy Checkoff funds to be expended on purposes beyond "appropriate plans or projects for advertisement and promotion of the sale and consumption" of dairy products, and research related to such advertisement and promotion. 7 U.S.C. § 4504(a).

138. By permitting Dairy Checkoff funds to be expanded to promote ESG-focused projects and related messaging, such actions amount to a rewrite of the Dairy Act by defining "appropriate plans or projects" and related "research" in a way that Congress did not intend for the statute to cover. *See id*.

139. Therefore, to the extent Defendants' actions purport to go beyond the statute, such actions violate the U.S. Constitution and must be set aside.

## RELIEF REQUESTED

Plaintiffs therefore request the following relief:

A. Enter a declaratory judgment that Defendants, in using Dairy Checkoff funds to provide financial support to the Innovation Center in violation of 7 U.S.C. § 4504(a), are violating the First Amendment and the APA;

B. Enter an injunction permanently enjoining Defendants from using Dairy Checkoff funds to support the Innovation Center in excess of statutory authority, as provided in 7 U.S.C. § 4504(a);

C. Award attorney's fees and costs to Plaintiffs as allowed by law;

D. Award any such further relief the Court deems appropriate.

Dated: June 9, 2026

Respectfully Submitted,

WISCONSIN INSTITUTE FOR
LAW & LIBERTY

*/s/ Rebecca C. Furdek*
Daniel P. Lennington (WI Bar No. 1088694)
Rebecca C. Furdek (WI Bar No. 1101543)

1241 North Franklin Place
Milwaukee, WI 53202
Phone: (414) 727-9455

Dan@will-law.org
Rebecca@will-law.org

*Attorneys for Plaintiffs*